**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **MICHAEL T. FLYNN,** | **Crim. No. 17-232 (EGS)** |
| **Defendant** | |

**GOVERNMENT'S RESPONSE TO COURT-APPOINTED *AMICUS CURIAE,***
**THE HONORABLE JOHN GLEESON (RET.)**

# TABLE OF CONTENTS

BACKGROUND AND STATEMENT OF FACTS ..................................................... 2

    A.    Factual Background .................................................................... 2

    B.    Procedural Background.................................................................... 7

ARGUMENT ..................................................................................... 9

I.    The Court Should Grant the Rule 48 Motion...................................................... 9

    A.    The Constitution and Rule 48 require the Court to grant the Government's motion to dismiss .................................................................... 9

        1.    The Constitution commits the power to prosecute to the Executive rather than the Judiciary........................................................... 10

        2.    Rule 48, read against the backdrop of the Constitution, ordinarily allows a court to review a motion to dismiss only to protect the interests of the defendant. ........................................................ 12

        3.    *Ammidown* does not provide a sound basis for adopting a contrary reading of Rule 48(a) ................................................................ 13

    B.    Court-appointed amicus's contrary arguments about the meaning of Rule 48 lack merit. ........................................................................ 15

        1.    Court-appointed amicus misinterprets Rule 48......................................... 15

        2.    Amicus's arguments for his interpretation of Rule 48 are unsound. ........ 18

        3.    Amicus errs in distinguishing pre-guilty plea from post-guilty plea motions to dismiss.................................................................... 20

    C.    Even if amicus's interpretation of Rule 48 were correct, he offers no valid reason to deny the government's motion in the circumstances of this case. ........ 22

        1.    The government was entitled to dismiss based on its assessment of the interests of justice................................................................ 25

        2.    The government was entitled to dismiss based on its concerns about materiality. ............................................................................. 26

        3.    The government expressed concerns about its ability to prove willful falsity to a jury. ........................................................................ 30

    II.    This Court Lacks Any Valid Basis For Initiating Its Own Investigation And Prosecution Of Flynn For Criminal Contempt...................................................... 32

A.      False statements in a plea colloquy or motion to withdraw are not contempt under 18 U.S.C. § 401 ........................................................................ 32

1.      False statements in a plea colloquy or motion to withdraw do not constitute actual obstruction ...................................................... 33

2.      False statements in a plea colloquy or motion to withdraw do not demonstrate an intent to obstruct ............................................. 38

B.      Even if Flynn's conduct constituted criminal contempt, the authority to prosecute him under the circumstances of this case would lie with the U.S. Attorney, not this Court ...................................................................... 39

C.      No factual investigation into Flynn's allegedly false statements in pleading guilty or in moving to withdraw his plea is warranted .......................... 40

CONCLUSION ............................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937) ................................................................................................ 11

*Association of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) .............................................................................. 17

*Berman v. United States,*
  302 U.S. 211 (1937) ................................................................................................ 21

*Bronsozian v. United States,*
  No. 19-6220, 2020 WL 1906543 (U.S. Apr. 20, 2020) ........................................ 20

*Brown v. United States,*
  356 U.S. 148 (1958) ................................................................................................ 35

*Clark v. Martinez,*
  543 U.S. 371 (2005) ................................................................................................ 22

*Clark v. United States,*
  289 U.S. 1 (1933) .............................................................................................. 34, 36

*Clay v. United States,*
  537 U.S. 522 (2003) ................................................................................................ 21

*Cmty. for Creative Non-Violence v. Pierce,*
  786 F.2d 1199 (D.C. Cir. 1986) ............................................................................ 10

*Collins v. United States,*
  269 F.2d 746 (9th Cir. 1959) ................................................................................ 35

*Dellums v. U.S. Nuclear Regulatory Commission,*
  863 F.2d 968 (D.C. Cir. 1988) .............................................................................. 14

*\*Ex parte Hudgings,*
  249 U.S. 378 (1919) .................................................................................... 33, 34, 35

*Heckler v. Chaney,*
  470 U.S. 821 (1985) .......................................................................................... 11, 15

*\*ICC v. Brotherhood of Locomotive Eng'rs,*
  482 U.S. 270 (1987) .................................................................................... 11, 15, 24

\*Authorities upon which we chiefly rely are marked with asterisks.

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) ...................................................................... 11, 17

*In re Brewer,*
    863 F.3d 861 (D.C. Cir. 2017) ............................................................................ 12

*In re Brown,*
    454 F.2d 999 (D.C. Cir. 1971) ...................................................................... 34, 38

*In re McConnell,*
    370 U.S. 230 (1962) ........................................................................... 32, 34, 37

*\*In re Michael,*
    326 U.S. 224 (1945) ................................................................... 32, 34, 37, 41

*In re Richards,*
    213 F.3d 773 (3d Cir. 2000) ............................................................................ 23

*In re Sealed Case,*
    627 F.3d 1235 (D.C. Cir. 2010) ........................................................................ 38

*\*In re United States,*
    345 F.3d 450 (7th Cir. 2003) ........................................................ 13, 16, 19, 23

*In re United States,*
    398 F.3d 615 (7th Cir. 2005) ...................................................................... 17, 24

*In re United States,*
    503 F.3d 638 (7th Cir. 2007) ............................................................................ 24

*Martin v. Franklin Capital Corp.,*
    546 U.S. 132 (2005) ........................................................................................ 18

*McCray v. United States,*
    195 U.S. 27 (1904) .......................................................................................... 16

*Nye v. United States,*
    313 U.S. 33 (1941) .......................................................................................... 34

*Okada v. Whitehead,*
    No. 15-cv-1449, 2017 WL 3442798 (C.D. Cal. July 28, 2017)..................... 35, 36

*Plaut v. Spendthrift Farm, Inc.,*
    514 U.S. 211 (1995) ........................................................................................ 21

*\*Rinaldi v. United States,*
    434 U.S. 22 (1977) .................................................................................. *passim*

*Sacher v. United States,*
    343 U.S. 1 (1952) .................................................................................... 40

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996) .................................................................................... 9

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ................................................................................. 12

*Thompson v. United States,*
    444 U.S. 248 (1980) ................................................................................. 20

*Thorpe v. Housing Authority of City of Durham,*
    393 U.S. 268 (1969) ................................................................................. 21

*United States v. Ammidown,*
    497 F.2d 615 (D.C. Cir. 1973) ......................................................... *passim*

*United States v. Appel,*
    211 F. 495 (S.D.N.Y. 1913) ..................................................................... 35

*\*United States v. Armstrong,*
    517 U.S. 456 (1996) ................................................................... 11, 15, 22

*United States v. Dominguez-Villa,*
    954 F.2d 562 (9th Cir. 1992) ................................................................... 16

*\*United States v. Dunnigan,*
    507 U.S. 87 (1993) .................................................................. 34, 37, 38, 39

*United States v. Florian,*
    765 F. Supp. 2d 32 (D.D.C. 2011) .......................................................... 19

*\*United States v. Fokker Services B.V.,*
    818 F.3d 733 (D.C. Cir. 2016) .......................................................... *passim*

*United States v. Gaudin,*
    515 U.S. 506 (1995) ................................................................................. 29

*United States v. Hector,*
    577 F.3d 1099 (9th Cir. 2009) ................................................................. 20

*United States v. HSBC Bank USA, N.A.,*
    863 F.3d 125 (2d Cir. 2017) ..................................................................... 23

*United States v. James,*
    861 F. Supp. 151 (D.D.C. 1994) .............................................................. 19

*United States v. Johnson,*
    20 F. Supp. 3d 144 (D.D.C. 2013) ........................................................................... 19

*United States v. Juvenile Male,*
    564 U.S. 932 (2011) ..................................................................................................... 12

*United States v. McGainey,*
    37 F.3d 682 (D.C. Cir. 1994) ...................................................................................... 33

*United States v. Nixon,*
    418 U.S. 683 (1974) ............................................................................................. 10, 15

*United States v. Richardson,*
    418 U.S. 166 (1974) ..................................................................................................... 17

*United States v. Safavian,*
    649 F.3d 688 (D.C. Cir. 2011) .................................................................................... 29

*United States v. Scantlebury,*
    921 F.3d 241 (D.C. Cir. 2019) .................................................................................... 13

*United States v. Schooner Peggy,*
    5 U.S. (1 Cranch) 103 (1801) ...................................................................................... 21

*\*Wayte v. United States,*
    470 U.S. 598 (1985) ......................................................................................... 17, 24, 31

*Yates v. United States,*
    355 U.S. 66 (1957) ................................................................................................. 32, 35

*\*Young v. United States ex rel. Vuitton et Fils S. A.,*
    481 U.S. 787 (1987) ................................................................................................. 40, 41

## Constitutional Provisions, Statutes, and Rules

U.S. Const. art. II, § 1, cl. 1 ................................................................................................ 10

U.S. Const. art. II, § 2, cl. 1 ................................................................................................ 10

U.S. Const. art. II, § 3 ......................................................................................................... 10

U.S. Const. art. III, § 1 ........................................................................................................ 40

U.S. Const. art. III, § 2, cl. 1 ............................................................................................... 11

18 U.S.C. § 401 ....................................................................................................... 32, 35, 36

18 U.S.C. § 953 .................................................................................................... 2

18 U.S.C. § 1001 ............................................................................................. 7, 28

18 U.S.C. § 1621 ................................................................................................ 35

18 U.S.C. § 3161 .................................................................................................. 9

Act of March 2, 1831, ch. 99, 4 Stat. 487 ........................................................ 32

Fed. R. Crim. P. 11 ....................................................................................... 22, 39

Fed. R. Crim. P. 42 ............................................................................................ 40

Fed. R. Crim. P. 48 ......................................................................................... 9, 22

**Other Authorities**

Adam Goldman & Michael S. Schmidt, *F.B.I. Agent Peter Strzok, Who Criticized Trump in Texts, Is Fired*, N.Y. Times (Aug. 13, 2018) ........................................................... 6

U.S. Dep't of Justice, *Justice Manual* (2020) ........................................................ 26, 30

U.S. Dep't of Justice, Office of the Inspector General, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* (February 2018) ........................................................................................... 6, 27

U.S. Dep't of Justice, Office of the Inspector General, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (December 2018) ........................................................................... 27

U.S.S.G. § 3C1.1 ............................................................................................... 35

The United States of America, by and through its undersigned counsel, respectfully files this response to the arguments and claims made by the Court-appointed amicus in his brief filed on June 10, 2020 (Doc. 233, hereinafter "Gleeson Br."). The Constitution vests in the Executive Branch the power to decide when—and when not—to prosecute potential crimes. Exercising that Article II power here, on May 7, 2020, the United States filed a motion to dismiss this case (Doc. 198), and defendant Michael T. Flynn consented (Doc. 202). That motion represents the authoritative position of the Executive and provides three alternative grounds for the dismissal: first, in the Executive's assessment, the interests of justice do not support continuing the prosecution; second, based on the Executive's legal analysis and assessment of the strength of the case, proving materiality to a jury beyond a reasonable doubt would be difficult; and third, based on the Executive's legal analysis and assessment of the strength of the case, proving willful falsity to a jury beyond a reasonable doubt would be difficult.

Under Article II, a court has no power to review that exercise of prosecutorial discretion. And under Article III, there is no longer any case or controversy between the government and the defendant over which this Court may properly exert judicial power. Federal Rule of Criminal Procedure 48(a) requires leave of court to dismiss a case, but nothing in Rule 48(a) authorizes the Court to disregard those fundamental constitutional limits. Quite the contrary, the "principal object of the 'leave of court' requirement" is "'to protect a defendant against prosecutorial harassment'"—an objective that is beside the point here, where the defendant has consented to the dismissal. *United States v. Fokker Services B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016). The Court should dismiss the case and should reject court-appointed amicus curiae's efforts to use Rule 48(a) for purposes that the Rule does not (and, under the Constitution, cannot) serve.

## BACKGROUND AND STATEMENT OF FACTS

### A.    Factual Background

Flynn served as a surrogate and advisor for then-candidate Donald J. Trump during the 2016 presidential campaign.  In 2016, the Federal Bureau of Investigation began investigating Flynn as part of a larger investigation into whether individuals associated with President Trump's campaign were coordinating with the Russian government to interfere with the election.  Doc. 198-3, at 2-3.

After several months, the FBI identified no "derogatory information" about Flynn and determined that he "was no longer a viable candidate" for investigation.  Doc. 198-2, at 3-4.  In early January 2017, the FBI stated in a draft internal memorandum that it was "closing [its] investigation" of Flynn.  *Id.* at 5.

Around the same time, the FBI learned that Flynn and Sergey Kislyak, then Russia's ambassador to the United States, had spoken by telephone on several occasions in late December, around the time that President Obama announced sanctions against Russia for election interference.  Doc. 198-4; Doc. 198-6, at 4.  The FBI later prepared transcripts of the relevant calls.  Doc. 198-6, at 8, 13; Doc. 223-4.  When they spoke, Flynn asked Kislyak not to escalate tensions in response to the sanctions, and Kislyak later confirmed that Russia had taken the incoming administration's position into account in determining its response.  Doc. 223-4, at 9-10, 13; Doc. 4, at 3.  FBI personnel considered whether Flynn had violated the Logan Act, 18 U.S.C. § 953, which prohibits U.S. citizens from trying to influence foreign governments in disputes with the United States.  *See* Doc. 198-9, at 2.  But that idea got little traction within the Department of Justice because there has never been a conviction under the Logan Act in its 200-year history and, regardless, communications by an incoming administration with foreign officials are not necessarily out of the ordinary.  Doc. 198-4, at 4; Doc. 198-5, at 3, 10; Doc. 198-6, at 10-11.

On January 4, 2017, Peter Strzok, then FBI Deputy Assistant Director, learned that Flynn's file "serendipitously" had been left open.  Doc. 198-8, at 2.  Strzok instructed agents to "keep [the investigation] open for now."  *Id*.  In subsequent electronic messages, Strzok and Lisa Page, then an FBI attorney, expressed relief and commented that the FBI's "utter incompetence" in failing to timely close the file was actually "help[ing]" them.  *Id*.

Approximately a week later, a news report indicated that Flynn and Kislyak had spoken on the day Russian sanctions were announced.  *See* Doc. 198-5, at 3.  A spokesperson for the President-Elect responded that Flynn's calls focused on logistics.  *Id*.  Two days later, the Vice President-Elect stated in a public news interview that he had spoken to Flynn and that Flynn's conversation with Kislyak did not relate to sanctions.  *Id*.  FBI Director James Comey took the view that the FBI should not notify the incoming administration about the content of the conversations between Flynn and Kislyak.  *Id*. at 5.  The Acting Attorney General, the Director of National Intelligence, and the director of the Central Intelligence Agency disagreed, but the latter two ultimately backed off.  *Id*.; Doc. 198-4, at 6.

On January 22, 2017, following the President's inauguration, Flynn was sworn in as National Security Advisor.  Doc. 133-1, at 1.  The next day, Comey directed two "experienced" FBI agents to interview Flynn.  Doc. 198-6, at 7.  Comey resolved that neither White House Counsel nor anyone at the Justice Department would be notified in advance of the interview.  *Id*.; Doc. 198-5, at 5-6.  On the day of the interview, the Acting Attorney General decided "enough was enough" and called Comey to tell him that it was time to notify the White House about the substance of Flynn's calls.  Doc. 198-5, at 5.  When Comey returned the call, he told her that two agents were already on the way to interview Flynn.  *Id.*  The Acting Attorney General and others

at the Department were "flabbergasted" that the FBI had decided to proceed without coordinating with the Department. Doc. 198-4, at 7.

Before the interview, FBI officials discussed whether to show Flynn the text of the relevant calls. In notes made to prepare for the discussion, FBI Assistant Director for Counterintelligence E.W. Priestap took the view that the FBI should "rethink" its decision not to show Flynn the text. Doc. 198-11. Priestap's notes observed that the FBI "regularly show[ed] subjects evidence with the goal of getting them to admit their wrongdoing." *Id*. In his notes, Priestap questioned whether the FBI's goal was getting the "[t]ruth/[a]dmission" or "get[ting] him to lie, so we can prosecute him or get him fired?" *Id*. FBI leadership ultimately decided not to show Flynn the text. Doc. 198-6, at 8; Doc. 198-14, at 4. They also decided, over the advice of career FBI attorneys, not to warn Flynn that lying to the FBI is a crime. Doc. 198-14, at 4; Doc. 198-10, at 6-7.

FBI Deputy Director Andrew McCabe spoke by phone to Flynn, asking to have two agents "sit down" with him to hear about his conversations with Kislyak. Doc. 198-12. Flynn noted that the FBI likely knew what was said in the calls because it "listen[s] to everything [the Russians] say." *Id*. McCabe indicated that he nevertheless wanted the interview to be done as "quickly, quietly and discre[et]ly as possible." *Id*. Flynn agreed to meet alone with the agents that same day without involving the White House Counsel's Office. *Id*.

Less than two hours later, Flynn met with Strzok and a second agent at the White House. Flynn was "relaxed," "unguarded," and "talkative." Doc. 198-14, at 4. He "clearly saw the FBI agents as allies." *Id*. The agents did not record the interview, but took handwritten notes. Doc. 198-13, at 2-8. After returning to the FBI, the agents drafted an FD-302, the FBI's Interview

Report form, summarizing the interview, and they continued to revise it thereafter.  Doc. 198-7, at 2-6; *see* Doc. 198-8, at 4.

According to the final FD-302, when the agents asked Flynn whether he recalled any conversation with Kislyak in which he encouraged Kislyak not to "escalate the situation" in response to the sanctions, Flynn responded, "Not really.  I don't remember.  It wasn't, 'Don't do anything.'"  Doc. 198-7, at 6.  According to the FD-302, the agents asked Flynn whether he recalled a conversation in which Kislyak stated that Russia had taken the incoming administration's position into account when responding to the sanctions; Flynn stated that he did not recall such a conversation.  *Id*.  The agents' handwritten notes do not reflect that question being asked or Flynn's response.  *See* Doc. 198-13, at 2-8.

The final FD-302 also reports that Flynn incorrectly stated that, in earlier calls with Kislyak, Flynn had not made any request about voting on a UN Resolution in a certain manner or slowing down the vote.  Doc. 198-7, at 5.  Flynn indicated that the conversation, which took place on a day when he was calling many other countries, was "along the lines of where do you stand[ ] and what's your position."  *Id*.  The final FD-302 also states that Flynn was asked whether Kislyak described any Russian response to his request and said that Kislyak had not, *id.*, although the agents' handwritten notes do not reflect Flynn being asked that question or giving that response, *see* Doc. 198-13, at 2-8.

After the interview, the agents agreed that Flynn "did not give any indicators of deception."  Doc. 198-14, at 4.  Both agents had the impression that Flynn "was not lying or did not think he was lying."  *Id*. at 5.  In their view, it was possible that Flynn really did not remember the substance of his calls with Kislyak.  *See* Doc. 198-5, at 6.  Comey later described the "two experienced agents" reporting that they "saw nothing that indicated to them that [Flynn] knew he was lying to

them." Doc. 198-6, at 7-8. When Comey was asked on March 2, 2017, whether he believed that Flynn lied, he responded "I don't know. I think there is an argument to be made that he lied. It is a close one." *Id*. at 10.

Soon after the interview, Priestap, Strzok, and other senior FBI officials briefed individuals at the Department. Doc. 198-4, at 7. When the Department raised the issue of re-interviewing Flynn, the FBI was "pretty emphatic" that a re-interview was unnecessary. Doc. 198-5, at 6; *see* Doc. 198-4, at 7. Department officials briefed the White House, and the Department arranged to provide transcripts of Flynn's calls. Doc. 198-5, at 7-11; Doc. 198-6, at 9. An internal Department memorandum indicates that, by late January 2017, merely days after Flynn's January 24 interview, the FBI advised the Department that it did not believe that Flynn was acting as a Russian agent. *See* Doc. 123, at 2. The President asked for Flynn's resignation on February 13. *See* Doc. 198-6, at 9.

Thereafter, new information emerged about essential participants in the investigation. Strzok, one of the agents who interviewed Flynn, was removed from the investigation due to apparent political bias and was later terminated from the Bureau. *See* Adam Goldman & Michael S. Schmidt, *F.B.I. Agent Peter Strzok, Who Criticized Trump in Texts, Is Fired*, N.Y. Times (Aug. 13, 2018), available at <www.nytimes.com/2018/08/13/us/politics/peter-strzok-fired-fbi.html>. The second interviewing agent was criticized by the Inspector General for his tactics in connection with the larger investigation. See Doc. 169, at 6-7. McCabe was fired after the Department of Justice determined that he lied under oath, including to FBI agents. U.S. Dep't of Justice, Office of the Inspector General, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* 2 (February 2018).

### B.    Procedural Background

On November 30, 2017, the Special Counsel's Office ("SCO") filed a criminal information charging Flynn with a single count of making false statements in violation of 18 U.S.C. § 1001(a)(2).  Doc. 1.  The next day, Flynn pleaded guilty to that offense before the Honorable Rudolph Contreras.  *See* Docs. 3, 4.  The statement of the offense provided that Flynn "made materially false statements and omissions" that "impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the [Trump] Campaign and Russia's efforts to interfere with the 2016 presidential election."  Doc. 4, at 1-2.  The case was subsequently reassigned to the Honorable Emmet G. Sullivan.  Doc. 9.

The Court set a sentencing hearing for December 18, 2018.  In pre-sentencing filings, the government agreed that Flynn had substantially cooperated and that a "sentence at the low end of the guideline range—including a sentence that does not impose a term of incarceration—[was] appropriate and warranted."  Doc. 46, at 1.  At the outset of the hearing, the Court informed Flynn that it would conduct an "extension … of the plea colloquy."  Doc. 103, at 5.  The Court asked Flynn to reaffirm his plea under oath.  *Id.* at 8-11.  On the advice of counsel, Flynn maintained his guilty plea and indicated that he was "ready to proceed to sentencing."  *Id.* at 11, 14, 17.  The Court suggested that Flynn consider delaying the sentencing until after his cooperation was complete.  *Id.* at 48.  After conferring with counsel, Flynn requested a continuance.  *Id.* at 47.

Flynn subsequently retained new counsel.  Doc. 88, at 2.  He then filed a *Brady* motion, which the Court denied.  Doc. 144, at 2-3.  In January 2020, Flynn moved to withdraw his guilty plea, asserting ineffective assistance of prior counsel.  Docs. 151, 154, 160.  The government has not yet responded to this motion.  Flynn also filed a motion to dismiss the case for government misconduct.  Doc. 162.  In February 2020, the government opposed Flynn's motion to dismiss.

Doc. 169.  Flynn repeatedly supplemented the motion after receiving the government's response, Docs. 181, 188, 189; the government has not submitted a further filing responding to the additional allegations.

On May 7, 2020, while those motions remained pending, the government moved to dismiss the case under Federal Rule of Criminal Procedure 48(a).  The government first explained a court's "narrow" role in addressing a Rule 48(a) motion.  Doc. 198, at 10 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016)).  The government then set out its reasons for the dismissal, explaining why it had concluded that continued prosecution was not warranted.  *Id.* at 12-20; *see* pp. 25-32, *infra*.  Flynn consented to the motion.  Doc. 202.

On May 13, 2020, the Court appointed Judge Gleeson as amicus curiae "to present arguments in opposition to the government's Motion to Dismiss"; it also directed amicus to "address whether the Court should issue an Order to Show Cause why Mr. Flynn should not be held in criminal contempt for perjury."  Doc. 205, at 1.  Court-appointed amicus then indicated that he intended to inform the Court about "any additional factual development" amicus may need "before finalizing [his] argument in opposition to the government's motion."  Doc. 209, at 1.

The Court subsequently set a briefing schedule on the government's Rule 48(a) motion, providing for multiple briefs submitted by the court-appointed amicus, the government, and Flynn, as well as additional briefs from other amici, with oral argument scheduled for July 16, 2020.  May 20, 2020 Minute Order.

Flynn petitioned the D.C. Circuit for a writ of mandamus directing this Court to grant the government's motion to dismiss.  The United States supported the request.  Oral argument on the petition was held on June 12, 2020, and the petition remains under consideration by the D.C. Circuit.

## ARGUMENT

I.    **The Court Should Grant the Rule 48 Motion**

A.    **The Constitution and Rule 48 require the Court to grant the Government's motion to dismiss**

Rule 48(a) provides: "The government may, with leave of court, dismiss an indictment, information, or complaint." The D.C. Circuit's decision in *Fokker* controls the interpretation of that provision here. The precise issue in *Fokker* was whether a district court could reject a speedy trial exclusion under 18 U.S.C. § 3161(h)(2) in connection with a deferred prosecution agreement (DPA). The D.C. Circuit, however, analogized between DPAs and Rule 48(a) motions, discussed the requirements for Rule 48(a) motions at length, and concluded that "[t]he same considerations" that governed the interpretation of Rule 48(a) also governed the "interpretation of the Speedy Trial Act provision at issue." *Fokker*, 818 F.3d at 742-43. The D.C. Circuit's discussion of Rule 48(a) motions was thus an integral part of its reasoning, and as a general matter, a higher court's "rationale" is just as binding on a lower court as "the result" the higher court reaches. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996).

In *Fokker*, the D.C. Circuit explained that courts must read legal provisions such as Rule 48(a) against "the background of settled constitutional understandings." 818 F.3d at 741. The court made clear that, under those settled constitutional understandings, the power to prosecute belongs to the Executive, not the Judiciary. *Id.* The court also made clear that Federal Rule of Criminal Procedure 48, read against the backdrop of that constitutional principle, ordinarily allows a court to review a motion to dismiss only to protect the interests of the defendant. *Id.* at 742. That understanding of Rule 48(a) is controlling here, and the D.C. Circuit's earlier decision in *United States v. Ammidown*, 497 F.2d 615 (D.C. Cir. 1973), does not suggest otherwise.

>   1.    *The Constitution commits the power to prosecute to the Executive rather*
>   *than the Judiciary.*

Article II provides that "[t]he executive Power shall be vested in a President," U.S. Const. art. II, § 1, cl. 1; that the President "shall have Power to grant Reprieves and Pardons for Offenses against the United States," § 2, cl. 1; and that the President "shall take Care that the Laws be faithfully executed," § 3.   In *Fokker*, the D.C. Circuit explained that those provisions, taken together, vest the power to prosecute crimes in the Executive.   818 F.3d at 741.   *Fokker* accords with the Supreme Court's recognition that, as a general matter, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."   *United States v. Nixon*, 418 U.S. 683, 693 (1974).   *Fokker* also accords with the D.C. Circuit's recognition in other cases that "[t]he power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws."   *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986).

Notably, the court in *Fokker* took pains to explain that the Executive's charging authority includes not only the power to initiate criminal prosecutions, but also the power to dismiss them. For example, the court explained that "[t]he Executive's charging authority embraces decisions about … *whether to dismiss charges once brought*"; that courts may not "second-guess the Executive's exercise of discretion over the … *dismissal of criminal charges*"; that "[d]ecisions … *to dismiss charges once brought* … 'lie at the core of the Executive's duty'"; that "few subjects are less adapted to judicial review than … *whether to dismiss a proceeding once brought*"; that "*decisions to dismiss pending criminal charges* … lie squarely within the ken of prosecutorial discretion"; and that the decision "*to dismiss criminal charges*" forms part of "the prosecution's core prerogative."   *Fokker*, 818 F.3d at 737-738, 741-744 (emphases added; brackets omitted). *Fokker*'s understanding of the scope of the Executive's authority has deep roots; for example, as

far back as 1800, then-Congressman John Marshall explained in a speech that the Executive may "direct that the criminal be prosecuted no further" as "the exercise of an indubitable and a constitutional power." *In re Aiken County*, 725 F.3d 255, 263 (D.C. Cir. 2013) (Kavanaugh, J.) (citation omitted).

The D.C. Circuit recognized in *Fokker* that, because the Constitution vests the power to initiate and dismiss prosecutions in the Executive, the Judiciary lacks the power "to review the prosecution's initiation and dismissal of charges." *Fokker*, 818 F.3d at 744; *see Aiken*, 725 F.3d at 263 (explaining that a "corollary" of "[t]he Executive's exclusive authority" is that "neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals"). A long line of Supreme Court decisions confirms that understanding. For example, in light of the executive power over prosecutions, the remedy for a selective prosecution based on impermissible considerations "is to dismiss the prosecution, not to compel the Executive to bring another prosecution," *Aiken*, 725 F.3d at 264 n.7; *see United States v. Armstrong*, 517 U.S. 456, 466-467 (1996); an agency's exercise of enforcement discretion is immune from judicial review under the Administrative Procedure Act, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); and "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review," *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("*BLE*").

In contrast to the executive authority vested in the President under Article II, Article III provides that the federal courts may exercise only "judicial Power" over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy is a "dispute between parties who face each other in an adversary proceeding." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937). And "an actual controversy must be extant at all stages of review." *Steffel v.*

*Thompson*, 415 U.S. 452, 459 n.10 (1974).  It follows that, if the dispute between the parties comes to an end, the court's exercise of judicial power must end as well.  For instance, if all parties to a civil case agree that the case should be dismissed, the stipulated dismissal "resolves all claims before the court" and "leav[es] [the court] without a live Article III case or controversy."  *In re Brewer*, 863 F.3d 861, 869 (D.C. Cir. 2017).

The Supreme Court has held that those Article III requirements apply to criminal cases no less than to civil cases.  *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (per curiam).  Thus, if the United States and a defendant agree that the information should be dismissed, there remains no dispute between the parties, there is no need for the court to impose judgment against the defendant, and there is no basis for the further exercise of the court's judicial power.

> 2.   *Rule 48, read against the backdrop of the Constitution, ordinarily allows a court to review a motion to dismiss only to protect the interests of the defendant.*

In *Fokker*, the D.C. Circuit read Rule 48(a)'s leave-of-court requirement "against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions."  818 F.3d at 738.  "Those settled principles," the D.C. Circuit emphasized, "counsel against interpreting statutes and rules in a manner that would impinge on the Executive's constitutionally rooted primacy over criminal charging decisions."  *Id*. at 742.

Against that backdrop, the D.C. Circuit explained that "the 'principal object of the "leave of court" requirement' has been understood to be a narrow one—'to protect a defendant against prosecutorial harassment.'"  *Fokker*, 818 F.3d at 742 (quoting *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam)).   The court observed that, if a prosecutor could dismiss unilaterally, he could harass a defendant "through repeated efforts to bring—and then dismiss— charges."  *Id.*  The court made clear that that concern provides a basis for judicial intervention only

"when the government moves to dismiss an indictment over the defendant's objection." *Id.* (quoting *Rinaldi*, 434 U.S. at 29 n.15) (brackets omitted).

At the same time, the D.C. Circuit concluded that "the 'leave of court' authority gives no power to a district court to deny [dismissal] based on a disagreement with the prosecution's exercise of charging authority" or "to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions." *Fokker*, 818 F.3d at 742-743. "For instance, a court cannot deny leave of court because of a view that the defendant should stand trial notwithstanding the prosecution's desire to dismiss the charges." *Id.* at 742. Nor may a court deny leave on the ground that the prosecution has "fail[ed] to redress the gravity of the defendant's alleged conduct." *Id.* "The authority to make such determinations remains with the Executive." *Id.*

The D.C. Circuit reaffirmed that view in *United States v. Scantlebury*, 921 F.3d 241 (D.C. Cir. 2019), when it explained that "[t]he 'leave of court' authority gives *no* power to a district court to deny [dismissal] based on a disagreement with the prosecution's exercise of charging authority." *Id.* at 250 (emphasis added; brackets and citation omitted). The D.C. Circuit's position also is consistent with *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003), where the Seventh Circuit explained that Rule 48(a) allows a court to "protect a defendant from the government's harass[ment]," but not to deny a motion to dismiss when "the defendant ha[s] agreed to it."

> 3.  *Ammidown does not provide a sound basis for adopting a contrary reading of Rule 48(a).*

The D.C. Circuit's decision in *Ammidown* does not support a contrary interpretation of Rule 48. As an initial matter, *Ammidown* involved a plea under Federal Rule of Criminal Procedure 11 rather than a motion to dismiss under Rule 48(a). *See* 497 F.2d at 619-20. The court's discussion of Rule 48(a) was thus unnecessary to its resolution of the case.

*Ammidown*'s dicta, moreover, are ambiguous on their own terms.  On the one hand, the court of appeals stated that, even "when the defendant concurs in the dismissal," a district court "will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis."  497 F.2d at 620.  The court further stated that the district court has "the role of guarding against abuse of prosecutorial discretion" and, to that end, should grant a motion to dismiss only if it is "satisfied that the reasons advanced for the proposed dismissal are substantial."  *Id.*  On the other hand, the court acknowledged that "the determination of the United States Attorney is to be followed in the overwhelming number of cases," that "[h]e alone is in a position to evaluate the government's prosecution resources and the number of cases it is able to prosecute," and that "it has traditionally been the prosecutor who determines which case will be pressed to conclusion."  *Id.* at 621.  In *Fokker*, the D.C. Circuit read those statements to mean that "courts generally *lack* authority to second-guess the prosecution's constitutionally rooted exercise of charging discretion."  *Fokker*, 818 F.3d at 750 (citing *Ammidown*, 497 F.2d at 621-622) (emphasis added).  The D.C. Circuit's own interpretation of *Ammidown* is controlling here.

By reading *Ammidown* that way, the D.C. Circuit avoided inconsistency between some statements in *Ammidown* and numerous subsequent decisions of the Supreme Court and of the D.C. Circuit.  *See, e.g.*, *Dellums v. U.S. Nuclear Regulatory Commission*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988) (treating a "circuit precedent" as "no longer binding," even though it had not been "formally buried … by the full court *en banc*," because it had been "eviscerated by subsequent Supreme Court decisions" and was "inconsistent with [the D.C. Circuit's] own subsequent cases").  The court in *Ammidown* did not address Article II, but since then, the Supreme Court has explained that "the Executive Branch has exclusive authority and absolute discretion to decide whether to

prosecute a case," *Nixon*, 418 U.S. at 693; that "the decision of a prosecutor in the Executive Branch not to indict" is "the special province of the Executive Branch," *Chaney*, 470 U.S. at 832; that "the refusal to prosecute cannot be the subject of judicial review," *BLE*, 482 U.S. at 283; and that the exercise of "a prosecutor's discretion" involves "the performance of a core executive constitutional function," *Armstrong*, 517 U.S. at 464-465. The court in *Ammidown* suggested that the principal object of Rule 48 is "guarding against abuse of prosecutorial discretion" and ensuring that "dismissal is in the public interest," 497 F.2d at 620, but according to the Supreme Court's subsequent opinion in *Rinaldi*, "[t]he principal object of the 'leave of court' requirement" is instead "to protect a defendant against prosecutorial harassment," 434 U.S. at 29 n.15. And the court in *Ammidown* treated dismissal under Rule 48 as similar to the approval of a plea agreement under Rule 11, 497 F.2d at 619-621, but the court in *Fokker* left no doubt that "a dismissal under Rule 48(a)" is "[u]nlike a plea agreement," because the latter leads to the court's entry of a judgment of conviction and a sentence, whereas the former does not, *Fokker*, 818 F.3d at 746.

## B. Court-appointed amicus's contrary arguments about the meaning of Rule 48 lack merit

### 1. Court-appointed amicus misinterprets Rule 48.

Court-appointed amicus argues that a court may properly examine whether the government's reasons are "pretextual," *see* Gleeson Br. 32-34, or involve "gross prosecutorial abuse," *see* Gleeson Br. 34-38. That interpretation of Rule 48(a) is incorrect.

To begin, court-appointed amicus's interpretation contradicts *Fokker*. The D.C. Circuit explained in *Fokker* that district courts lack power "*to scrutinize* the prosecution's discretionary charging decisions"; that the Executive may exercise "authority over criminal charging decisions … *without the involvement of—and without oversight power in—the Judiciary*"; that Rule 48(a) "confers no new power in the courts *to scrutinize* … the prosecution's exercise of its traditional

authority"; that courts lack authority "*to scrutinize* prosecutorial charging choices"; that charging decisions "are ill-suited to substantial *judicial oversight*"; and that courts err by "subject[ing] [charging decisions] to *judicial scrutiny*."  818 F.3d at 741, 743-744, 750 (emphases added).  In violation of those commands, amicus's interpretation necessarily involves subjecting the Executive's decision to judicial scrutiny, oversight, and potential nullification.

Those features of amicus's interpretation make clear that it also would violate Article II.  Although federal courts have authority to address constitutional violations in specific cases, they do "not have general supervisory powers over the co-equal executive branch of government."  *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992).  Thus, in the absence of a constitutional violation, courts lack the free-floating power to invalidate an exercise of executive power "on the assumption that a wrongful purpose or motive has caused the power to be exerted."  *McCray v. United States*, 195 U.S. 27, 56 (1904).  Courts likewise lack the authority to invalidate a coordinate branch's exercise of power on the grounds of "abuse," or even "gross abuse."  *See id.* at 54.  It would plainly violate Article I to disregard a statute on the ground that the reasons stated in the statutory preamble are "pretextual" and that Congress's real motivation was to favor special interests.  Similarly, it would plainly violate the Pardon Clause to disregard a presidential pardon on the ground that the pardon constitutes "gross abuse."  It would likewise violate the Take Care Clause to overturn an exercise of prosecutorial discretion on similar grounds.  "The Constitution does place judicially enforceable limits on the powers of the nonjudicial branches of the government—for example, the government may not make its prosecutorial decisions on racially discriminatory grounds—but they are the limits found in the Constitution," *In re United States*, 345 F.3d at 453, and thus do not include "pretext" and "gross abuse."  And even where the Executive does violate the Constitution by "selectively prosecut[ing] someone

based on impermissible considerations, the equal protection remedy is to dismiss the prosecution, not to compel the Executive to bring another prosecution." *Aiken*, 725 F.3d at 264 n.7.

Amicus's interpretation would additionally violate Article III. Article III grants courts the limited power to decide cases and controversies, not the unbounded power "to oversee the conduct of the National Government." *United States v. Richardson*, 418 U.S. 166, 179 (1974). A court has no basis for exercising judicial power in the absence of a case or controversy—even if, as here, an amicus curiae accuses a branch of government of favoritism or abuse.

Further, amicus's interpretation would cause grave harm to the Executive Branch, by forcing the Executive to reveal its internal deliberations in order to satisfy a court that its decision is not "pretextual" or "abusive." Article II guarantees the Executive the authority to "deliberate in confidence." *Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). And "federal judges may not insist that prosecutors reveal deliberative or pre-decisional materials." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (per curiam). As the Supreme Court has explained, moreover, "subjecting the prosecutor's motives and decisionmaking to outside inquiry" entails "systemic costs of particular concern": it "delays" the implementation of the prosecutor's decision, "threatens to chill law enforcement," and "may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Wayte v. United States*, 470 U.S. 598, 607 (1985).

None of this is to suggest that prosecutorial favoritism is appropriate or that abuses of prosecutorial power must go unchecked. As then-Judge Kavanaugh wrote in *Aiken*, "[t]he remedy for . . . abuses of the power . . . to decline to prosecute comes in the form of public disapproval, congressional 'retaliation' on other matters, or ultimately impeachment in cases of extreme abuse"—not in the form of judicial override. 725 F.3d at 266.

2.    *Amicus's arguments for his interpretation of Rule 48 are unsound.*

Amicus offers a variety of arguments for his interpretation of Rule 48(a), but those arguments lack merit.    To start, court-appointed amicus emphasizes that the leave-of-court requirement "obviously vest[s] some discretion in the court."    Gleeson Br. 26 (quoting *Rinaldi*, 434 U.S. at 29 n.15).    The government agrees that the requirement grants the Court some discretion; our only point is that the discretion enables the court to protect the defendant, not to engage in a broad inquiry into the Executive's motives or the public interest.    "Discretion is not whim," and a court's exercise of discretion "'is to be guided by sound legal principles.'"    *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005).    Here, those legal principles, resting on the fundamental separation of powers, preclude courts from scrutinizing the Executive's exercise of prosecutorial discretion in the manner that amicus proposes.

Court-appointed amicus also argues that the history of Rule 48(a) shows that the original purpose of the Rule was to enable courts to protect against favoritism.    Gleeson Br. 29.    For several reasons, that argument does not support his reading of the Rule.    First, his understanding of the Rule's purpose contradicts both *Rinaldi* and *Fokker*.    In those cases, the Supreme Court and the D.C. Circuit made plain that the "principal object" of the "leave of court" requirement is "to protect a defendant against prosecutorial harassment"—not, as amicus now maintains, to protect the public interest.    *Fokker*, 818 F.3d at 742 (quoting *Rinaldi*, 434 U.S. at 29 n.15).    Second, that understanding of Rule 48(a) would make little sense as a practical matter.    Even if a court believes that a refusal to prosecute rests on an improper motive or amounts to a "gross abuse," it would lack any practical mechanism for forcing the Executive to prosecute a case against its will.    The absence of any such practical means of enforcement shows that Rule 48(a)'s leave-of-court requirement serves a different interest—namely, to protect defendants from dismissals without prejudice that would allow for harassment through reprosecution, not to encourage broad judicial

inquiries into whether unopposed dismissals serve the Court's view of the public interest. Third, in all events, the meaning of Rule 48(a) turns on its text, read "against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions," *Fokker*, 818 F.3d at 738—not on the intentions or expectations of the Rule's drafters. Even assuming for the sake of argument that the drafters intended in 1944 to empower courts to deny "pretextual" or "abusive" dismissals, more recent decisions of the Supreme Court and D.C. Circuit show that such an approach would violate the separation of powers.

Amicus also errs in claiming that case law supports his reading of Rule 48(a). Gleeson Br. 35-36. Amicus cites three cases decided by this Court, but all three of those cases predate *Fokker*, *see id.* at 35; two of the three ultimately granted the motion to dismiss, *see United States v. Johnson*, 20 F. Supp. 3d 144, 148 (D.D.C. 2013); *United States v. Florian*, 765 F. Supp. 2d 32, 37 (D.D.C. 2011); and the third case held that a governmental notice of dismissal was ineffective for purposes of the Speedy Trial Act because the government had simply filed the dismissal with the clerk of court, rather than filing a motion as required by Rule 48(a), *see United States v. James*, 861 F. Supp. 151, 154 (D.D.C. 1994). Amicus also cites a number of appellate cases from outside this Circuit, *see* Gleeson Br. 36, but "[w]e are unaware … of any appellate decision that actually upholds a denial of a motion to dismiss a charge on such a basis," *In re United States*, 345 F.3d at 453. And in any event, those out-of-circuit decisions could not overcome the D.C. Circuit's controlling decision in *Fokker*.

Finally, amicus suggests that the Judiciary has an interest in avoiding complicity in politically motivated decisions, but when the Executive obtains dismissal under Rule 48(a), "[t]he court never exercises its coercive power by entering a judgment of conviction or imposing a sentence." *Fokker*, 818 F.3d at 746. The government's motion here thus involves only "the

Executive's traditional power over charging decisions," not "the Judiciary's traditional authority over sentencing decisions." *Id.* Just as in *Fokker*, the government's motion does not require the Court to enter a judgment of conviction or to exercise any sentencing authority.

> 3. *Amicus errs in distinguishing pre-guilty plea from post-guilty plea motions to dismiss.*

Court-appointed amicus acknowledges that "[t]he Executive Branch had the unreviewable discretion to never charge Flynn with a crime." Gleeson Br. 59. Court-appointed amicus further recognizes that, "[w]here prosecutors seek dismissal of charges *before* a defendant has entered a guilty plea, … denial of leave would raise questions about continuance of the prosecution over protest by the Executive." *Id.* at 31 n.33. Amicus argues, however, that the court may properly deny the motion to dismiss because the government has filed it *after* the entry of a guilty plea. *Id.* That understanding of Rule 48(a) is incorrect.

Amicus's interpretation contradicts precedent. It is "well established that the government may move to dismiss even after a complaint has turned into a conviction." *United States v. Hector*, 577 F.3d 1099, 1101 (9th Cir. 2009). For example, in *Rinaldi*, the Supreme Court ordered dismissal under Rule 48(a) even though the government's motion "was not made until after the trial had been completed." 434 U.S. at 25. Indeed, even in cases where the Solicitor General has determined that Justice Department policies require dismissal after a judgment has been entered and affirmed on appeal, the Supreme Court "has consistently responded … by granting certiorari and vacating the judgments" to permit dismissal under Rule 48(a). *Thompson v. United States*, 444 U.S. 248, 249 (1980) (per curiam); *see, e.g.*, *Bronsozian v. United States*, No. 19-6220, 2020 WL 1906543, at *1 (U.S. Apr. 20, 2020) (dismissal after conviction, sentencing, and affirmance by the court of appeals).

Amicus's interpretation lacks a sound basis in the Constitution.  "[J]udgment in a criminal case means sentence."  *Berman v. United States*, 302 U.S. 211, 212 (1937).  And a judgment becomes "final" for purposes of the separation of powers only after "all appeals have been forgone or completed."  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995); *see Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.").  If a judgment has become final after exhaustion of appeals, neither Congress nor the Executive may force a court to reopen it.  *Plaut*, 514 U.S. at 227.  If a judgment has not yet become final, however, a court must "give effect to [the coordinate branch's] latest [exercise of its constitutional powers]"—even if the coordinate branch has changed its mind since the start of the case, and even if accepting that change "has the effect of overturning" an earlier judicial ruling.  *Id.*; *see, e.g.*, *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801) (court must give effect to change in statute during the pendency of the case); *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 282 (1969) (court must give effect to change in administrative regulation during the pendency of the case).  Here, this Court has not yet pronounced sentence, so there is not even a judgment, much less one that has become final after the exhaustion of appeals.  Far from authorizing further proceedings at the district court's behest, the Constitution requires the court to honor the Executive's unopposed decision to drop the pending charges, and precludes the case from proceeding to sentencing in the absence of a live controversy.

Finally, amicus's interpretation lacks any sound basis in the text of Rule 48(a).  Rule 48(a) sets forth a unitary leave-of-court standard—not one standard for proceedings before a plea and another standard for proceedings after a plea.  When the rulemakers meant to set forth different

standards for different phases of a criminal case, they said so explicitly.  *Compare* Fed. R. Crim. P. 48(a) (setting forth a single standard), *with* Fed. R. Crim. P. 11(d) (setting forth different standards for withdrawal of a plea "before the court accepts the plea" and "after the court accepts the plea").  And there is no sound reason to believe that Rule 48(a) serves one purpose (protecting the defendant) before the entry of a guilty plea, yet an entirely different purpose (preventing favoritism or abuse) after the entry of a guilty plea.  Amicus errs in arguing that Rule 48(a)'s unitary standard should nonetheless carry different meanings during different phases of the trial because "separation of powers concerns" are "heightened" before the entry of a plea, yet "have significantly less force in the post-plea setting."  Gleeson Br. 31 n.33.  The Supreme Court has explained that when a legal provision raises constitutional concerns in some settings but not others, "[t]he lowest common denominator, as it were, must govern" across the board.  *Clark v. Martinez*, 543 U.S. 371, 380 (2005).  A court may not treat a legal provision as "a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each case."  *Id.* at 382.

> **C.    Even if amicus's interpretation of Rule 48 were correct, he offers no valid reason to deny the government's motion in the circumstances of this case**

Even assuming that a district court may ever deny an unopposed motion to dismiss, it may do so only in extraordinary circumstances.  The Supreme Court has explained that, even in those few areas where a federal court may review a decision whether to prosecute, the court must apply a "presumption of regularity," presuming that prosecutors "have properly discharged their official duties" unless "clear evidence" shows otherwise.  *Armstrong*, 517 U.S. at 464 (citation omitted).  The D.C. Circuit likewise has emphasized that "'judicial authority is … at its most limited' when reviewing the Executive's exercise of discretion over charging determinations."  *Fokker*, 818 F.3d at 741.

Other courts of appeals agree that any authority a district court may have to deny an unopposed motion to dismiss is limited. Some have treated Rule 48(a) as a purely procedural requirement—"a 'sunshine' provision" that requires the prosecution to provide reasons for its decision, but that grants the court no "substantive" authority to review the adequacy of those reasons. *In re Richards*, 213 F.3d 773, 788-789 (3d Cir. 2000). Others have stated that "any authority a court might have to deny a Rule 48(a) motion would be limited to cases in which dismissal is 'clearly contrary to manifest public interest.'" *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141 (2d Cir. 2017). Courts "that have elucidated this 'public interest' test have stressed how 'severely cabined' it is, 'equat[ing] a dismissal that is clearly contrary to the public interest with one in which the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial.'" *Id.* If a prosecutor "accepts a bribe" or prefers "to go on vacation rather than conduct a trial," his actions would suggest that he "is acting alone rather than at the direction or with the approval of the Justice Department." *In re United States*, 345 F.3d at 454.

Even if they applied, those standards would not allow a Rule 48 denial in these circumstances. The Rule 48(a) motion here represents the authoritative position of the Executive Branch, and moreover it provides a facially adequate explanation for the Executive's decision on three alternative grounds: first, that in the Executive's assessment, the interests of justice do not support continuing the prosecution; second, that based on the Executive's legal analysis and assessment of the strength of the case, proving materiality to a jury beyond a reasonable doubt would be difficult; and third, that based on the Executive's legal analysis and assessment of the strength of the case, proving willful falsity to a jury beyond a reasonable doubt would be difficult. The court-appointed amicus attempts to debate the government on several of these points, urging

the Court to second-guess the government's analysis. Gleeson Br. 39-55. But none of the reasons the government gave in its motion to dismiss may be substantively reviewed by a court.

First, the "interests of justice" standard, which turns on the Executive's enforcement priorities, the relationship between the case and the Executive's overall enforcement plan, and the Executive's policy assessments, is quintessentially unreviewable, *see, e.g., Fokker*, 818 F.3d at 741-742—a proposition even amicus does not appear to question. Second, the Executive's assessment about the "strength of the case" is "particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. Third, the government's legal analysis, although within the competence of a court to assess, is likewise unreviewable. As the Supreme Court has explained, "it is entirely clear" that a prosecutor's "refusal to prosecute" based on the belief "that the law will not sustain a conviction … cannot be the subject of judicial review." *BLE*, 482 U.S. at 283.

Tellingly, in challenging the motion to dismiss, amicus questions the government's decision-making process in this case. *See, e.g.*, Gleeson Br. 25, 56-59. But "the United States Attorney is not answerable to a judge for the deliberations among his staff." *In re United States*, 398 F.3d at 618. "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate." *Id*. Indeed, the Seventh Circuit has granted mandamus on this very ground. *Id.* at 620; *see In re United States*, 503 F.3d 638, 641 (7th Cir. 2007). As the Supreme Court has recognized, "[j]udicial supervision" related to the Executive's decisions about whom to prosecute would impermissibly "subject[] the prosecutor's motives and decisionmaking to outside inquiry" and threaten to "reveal[] the Government's enforcement policy." *Wayte*, 470 U.S. at 607. The amicus's approach is, in short, flatly impermissible. For those reasons, even assuming that a court has broad powers under Rule 48, those powers do not extend to looking beyond the government's stated

reasons in this case to a determination of whether the court believes those reasons were mistaken, whether the Court would have adopted the same analysis in the shoes of the prosecutor, or whether the court approves of the process through which the Executive arrived at its reasoning.

In any event, the Executive's determination that dismissal is warranted for each of three separate reasons described in the government's Rule 48(a) motion amply supports its exercise of discretion in this case.

1.    *The government was entitled to dismiss based on its assessment of the interests of justice.*

In its motion to dismiss, the government first explained that, after "extensive review and careful consideration," it had determined that continued prosecution of the case would "not serve the interests of justice." Doc. 198, at 1. It explained that record materials could be taken to suggest that the FBI "was eager to interview Mr. Flynn irrespective of any underlying investigation" and that the interview was undertaken predominantly "to elicit those very false statements and thereby criminalize Mr. Flynn." *Id.* at 16-17. As further discussed below, the FBI had determined that Flynn was not an agent of Russia by January 2017, and there was evidence that the calls did not change its assessment. *See* pp. 26-27, *infra.* When discussing Flynn's calls with Kislyak, one of the interviewing agents expressed relief at the "serendipit[y]" that the Flynn file had been inadvertently left open and commented that the FBI's "utter incompetence" in failing timely to close the file was actually "help[ing]" them. Doc. 198-8, at 2. And the notes of the FBI Assistant Director for Counterintelligence questioned the purpose of the interview and whether it was going to be conducted in a manner that would to get the "[t]ruth" or instead would "get [Flynn] to lie, so we can prosecute him or get him fired." Doc. 198-11. The Executive Branch is entitled to determine that, based on the circumstances surrounding the interview, it can no longer make the "policy judgment" that continued prosecution serves a substantial federal interest. Doc. 198, at 2

(quoting U.S. Dep't of Justice, Justice Manual § 9-27.001 (2020)); *see Fokker*, 818 F.3d at 743. Court-appointed amicus makes no attempt to disprove this rationale—and with good reason because, as just explained, it is a judgment quintessentially in the Executive's prerogative. That rationale, standing alone, fully justifies the Executive's decision to dismiss and amicus's lack of response on this point should be the end of the matter under any standard.

> 2. *The government was entitled to dismiss based on its concerns about materiality.*

The government alternatively explained in its motion that, "mindful of the high burden to prove every element of [the] offense beyond a reasonable doubt," it no longer believes it could secure a conviction at trial. Doc. 198, at 2.

The government expressed concern specifically about its ability to prove materiality. The government obtained Flynn's plea on the theory that his "false statements and omissions impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the [Trump] Campaign and Russia's efforts to interfere with the 2016 presidential election." Doc. 4, at 1-2. (A fact, it bears noting, that was not in Flynn's personal knowledge.) But the government identified substantial evidence that neither the truthful information nor the fact of any false statement was influential in that investigation. Doc. 198, at 13-18 & n.6.

The record reflects that, before learning of Flynn's calls with Kislyak, the FBI had concluded that Flynn was not an agent of Russia and determined that he "was no longer a viable candidate" for investigation. Doc. 198-2, at 3-4. And there was additional evidence that the FBI did not change its assessment after learning the content of Flynn's calls with Kislyak. *See, e.g.*, Doc. 198-8, at 2; Doc. 123, at 2. Indeed, shortly after Flynn made false statements to the FBI about his communications with Kislyak, the FBI concluded that Flynn was not an agent of Russia. Doc.

123, at 2.  In addition, the record revealed questions about how the interview was conducted, and whether it was conducted in a way that would shed light on Flynn's relationship with Russia and the significance of any false statements about the calls with Kislyak.  Doc. 198-4, at 4; Doc. 198-5, at 3, 10; Doc. 198-6, at 10-11.  And it revealed confusion and disagreement about the purpose and legitimacy of the interview and its investigative basis, as well as significant procedural irregularities.  Doc. 198-4, at 6-7; Doc. 198-5, at 5; Doc. 198-11; Doc. 198-14, at 4; Doc. 198-9, at 2.  The government's Rule 48(a) motion accordingly explained that it doubted whether, in light of those aspects of the record, it should attempt to prove to a jury that the information was objectively material.  Doc. 198, at 17.

Furthermore, since the time of the plea, extensive impeaching materials had emerged about key witnesses the government would need to prove its case.  Strzok was fired from the FBI, in part because his text messages with Page revealed political bias against the current administration and "implie[d] a willingness to take official action to impact the presidential candidate's electoral prospects."  U.S. Dep't of Justice, Office of the Inspector General, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* xii (December 2018).  The second interviewing agent has been accused of acting improperly in connection with the broader investigation.  McCabe, who authorized Flynn's interview without notifying either the Department of Justice or the White House Counsel, was fired for conduct that included lying to the FBI and lying under oath.  U.S. Dep't of Justice, Office of the Inspector General, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* 2 (February 2018).  In addition, significant witnesses have pending investigations or lawsuits against the Department of Justice, which could create further questions about their testimony at trial.  *See Strzok v. Barr*, Civ. No. 19-2367 (D.D.C. Aug. 6, 2019); *McCabe v. Barr,*

Civ. No. 19-2399 (D.D.C. Aug. 8, 2019); *Page v. Dep't of Justice*, Civ. No. 19-3675 (D.D.C. Dec. 10, 2019). Those developments further support the government's assessment about the difficulty it would have in proving its case to a jury beyond a reasonable doubt.[1]

Amicus attempts to cut off this inquiry, stating that this Court has already determined that the statements are material, and that the determination is the "law of the case," Gleeson Br. 49, pointing to the Court's December 2019 opinion rejecting petitioner's *Brady* arguments, in which the Court concluded that "Mr. Flynn's false statements were material within the meaning of 18 U.S.C. § 1001(a)(2)." Doc. 144, at 53. But as the Supreme Court has held, determining whether information is material is an essential element of the crime that must be determined by a jury, and

---

[1]    Before Flynn's 2017 guilty plea, the government provided Flynn with (1) the FBI report for Flynn's January 24 interview; (2) notification that the DOJ Inspector General, in reviewing allegations regarding actions by the DOJ and FBI in advance of the 2016 election, had identified electronic communications between Strzok and Page that showed political bias that might constitute misconduct; (3) information that Flynn had a sure demeanor and did not give any indicators of deception during the January 24 interview; and (4) information that both of the interviewing agents had the impression at the time that Flynn was not lying or did not think he was lying.

The government subsequently provided over 25,000 pages of additional materials pursuant to this Court's broad Standing Order, which it issues in every criminal case, requiring the government to produce "any evidence in its possession that is favorable to [the] defendant and material either to [his] guilt or punishment." Doc. 20, at 2. The majority of those materials, over 21,000 pages of the government's production, pertain to Flynn's statements in his March 7, 2017 FARA filing, for which the government agreed not to prosecute him as part of the plea agreement. The remainder are disclosures related to Flynn's January 24, 2017, statements to the FBI, and his many debriefings with the SCO.

The government disclosed approximately 25 pages of documents in April and May 2020 as the result of an independent review of this case by the United States Attorney for the Eastern District of Missouri. While those documents, along with other recently available information, *see, e.g.*, Doc. 198-6, are relevant to the government's discretionary decision to dismiss this case, the government's motion is not based on defendant Flynn's broad allegations of prosecutorial misconduct. Flynn's allegations are unfounded and provide no basis for impugning the prosecutors from the D.C. United States Attorney's Office.

cannot be determined as a matter of law by a court.  *United States v. Gaudin*, 515 U.S. 506, 511-512, 522-523 (1995).  Indeed, the materiality inquiry is "peculiarly one for the trier of fact" because it requires "delicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences to him."  *Id.* at 512 (internal quotation marks and brackets omitted).  For that reason, the Court's determination could not resolve the government's concerns about its materiality case at trial.  In any event, additional information that was not before the Court emerged in the months since the decision that significantly alters the analysis.

Amicus makes much of the fact that a defendant's false statements can be material even when the investigators are not deceived by them, accusing the government of asking for "the suspension of settled law for this case, but not for any others."  Gleeson Br. 46-47 (citing *United States v. Safavian*, 649 F.3d 688, 691-692 (D.C. Cir. 2011) (per curiam)).  Contrary to amicus's assertion (at 46-47), however, that is entirely consistent with the government's analysis.  In *Safavian*, the D.C. Circuit rejected a defendant's argument that his false statements were not material where the interviewing FBI agent "knew, based upon his knowledge of the case file, that the incriminating statements were false when [the defendant] uttered them."  649 F.3d at 691.  As the government recognized in its motion to dismiss, the fact that the FBI knew at the time it interviewed Flynn the actual contents of his conversations with Kislyak does not render them immaterial.  *See* Doc. 198, at 17 (citing *Safavian*, 649 F.3d 688 at 691-692).  Rather, the fact that the FBI knew the content of the conversations is relevant because it would allow a jury to assess the significance the FBI in fact attached to that truthful information when the FBI learned it; and, absent reason to think that the FBI's reaction was objectively unreasonable, that would inform the jury's assessment of the significance a reasonable decisionmaker would attach to the information.

3.     *The government expressed concerns about its ability to prove willful*
*falsity to a jury.*

Separately, after comprehensive review, the government was also concerned that it would

be unable to prove beyond a reasonable doubt that Flynn willfully made false statements.  Doc.

198, at 18-20.  Although Flynn previously pleaded guilty, it is Justice Department policy that

prosecutions should not be initiated—and thus should not be continued—"unless the attorney for

the government believes that the admissible evidence is sufficient to obtain and sustain a guilty

verdict by an unbiased trier of fact."  Justice Manual § 9-27.200 cmt.  Given Flynn's efforts to

withdraw the plea, the government's assessment of how a jury would perceive his explanations for

pleading guilty, and the government's assessment of the evidence independent of the plea, the

government determined that it should not rely on the plea in this case.

The government determined that the foundational evidence of willful falsity would have

had major weaknesses at trial in light of the interviewing agents' own doubts about whether Flynn

was lying, the equivocal nature of some of the critical statements in his interview, and substantial

impeaching material for the key witnesses.  In particular, the two agents who conducted the

interview—both highly experienced investigators—concluded that Flynn "did not give any

indicators of deception."  Doc. 198-14, at 4.  Despite knowing the true content of the calls, both

agents had the impression that Flynn "was not lying or did not think he was lying."  *Id*. at 5.  In

their view, it was possible that Flynn really did not remember the substance of his calls with

Kislyak.  *See* Doc. 198-5, at 6.  Given those reactions, when Comey was asked on March 2, 2017,

whether he believed that Flynn lied, he responded, "I don't know.  I think there is an argument to

be made that he lied.  It is a close one."  Doc. 198-6, at 10.  In light of Comey's own uncertainty

that Flynn's statements were willfully false—despite Comey's full knowledge of the actual content

of the conversations—the government was justified in being concerned that proving willful falsity to a jury beyond a reasonable doubt would be difficult.

Those concerns were amplified given that the jury would have to trust the interviewing agents' account of what statements Flynn in fact made. The interview was not recorded and the final FD-302 includes two instances where the agents did not record a critical question and answer in their handwritten notes: (1) that agents asked Flynn whether he recalled a conversation in which Kislyak stated that Russia had taken the incoming administration's position into account when responding to the sanctions, and Flynn stated that he did not recall such a conversation; and (2) that the agents asked whether Kislyak described any Russian response to his request, and Flynn said that Kislyak had not. *Compare* Doc. 198-7, at 5-6, *with* Doc. 198-13, at 2-8. While such discrepancies would not always be significant, given the other evidence and substantial impeaching materials on the key witnesses, it posed another reason to doubt the government's ability to make out its case beyond a reasonable doubt to a jury in the circumstances of this case.

The government's judgment about the underlying strength of the case, and its decision not to rely on the plea, are "particularly ill-suited to judicial review." *Wayte*, 470 U.S. 598, 607 (1985). And just as in *Rinaldi*, where the district court was required to grant a postconviction Rule 48(a) motion, *see* 434 U.S. at 32, the government's motion here applied an established charging policy.

*   *   *

Simply put, this Court has no authority to reject the Executive's determination that it should dismiss the charges in this case. The government's detailed explanation is far more than "a mere conclusory statement," *Ammidown*, 497 F.2d at 620, amply satisfying any procedural requirement that the government provide reasons for its decision to end a prosecution. There also is no evidence at all—much less the kind of clear evidence needed to overcome the presumption of regularity—

that the prosecutors were motivated by bribery or similar considerations. Because this case involves "the prosecution's constitutionally rooted exercise of charging discretion," it is a "usurpation of judicial power" to second-guess it. *Fokker*, 818 F.3d at 750 (citation omitted).

## II.    This Court Lacks Any Valid Basis For Initiating Its Own Investigation And Prosecution Of Flynn For Criminal Contempt

Court-appointed amicus agrees thathis Court should not initiate a criminal-contempt prosecution against Flynn for perjury. Gleeson Br. 60-72. Amicus contends, however, that (1) there is "ample evidence" that Flynn committed criminal contempt, and (2) if he did, the authority to initiate a prosecution for that offense lies with this Court. *Id*. at 60. Amicus is wrong in both respects. Even if Flynn committed perjury before this Court, perjury alone is not criminal contempt under 18 U.S.C. § 401(1). And even if Flynn's conduct were punishable as contempt, the authority to prosecute him under the circumstances of this case would lie with the Executive, not this Court. This Court therefore has no valid basis for initiating its own investigation or prosecution of Flynn for criminal contempt.

### A.    False statements in a plea colloquy or motion to withdraw are not contempt under 18 U.S.C. § 401

The current contempt statute, 18 U.S.C. § 401, "is based on [the] Act passed in 1831." *In re McConnell*, 370 U.S. 230, 233 (1962). Congress enacted the Act of March 2, 1831, ch. 99, 4 Stat. 487, to "drastically" "curtail the range of conduct which Courts could punish as contempt." *In re Michael*, 326 U.S. 224, 227 (1945). Like its predecessor, Section 401 "limit[s]" the "contempt power" to "specific situations." *Yates v. United States*, 355 U.S. 66, 71 (1957).

One of those situations is specified in Section 401(1). Section 401(1) provides that "[a] court of the United States shall have power to punish by fine or imprisonment … such contempt of its authority" as "[m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1). An offense under Section 401(1) thus has four

elements:  "[1] misbehavior of a person, [2] in or near to the presence of the court, [3] which obstructs the administration of justice, and [4] which is committed with the required degree of criminal intent." *United States v. McGainey*, 37 F.3d 682, 684 (D.C. Cir. 1994).

Flynn pleaded guilty to the offense charged in the information but later moved to withdraw his plea, asserting his innocence.  Court-appointed amicus contends (at 62 & n.63) that Flynn committed perjury before this Court, either in pleading guilty or in moving to withdraw his plea. Court-appointed amicus contends (at 61-62) that Flynn's false statements satisfy each of the elements of criminal contempt under Section 401(1).  Even assuming that Flynn committed perjury, however, his conduct does not satisfy either the "obstruction" or the "intent" elements of contempt under Section 401(1).  As the amicus brief of the National Association of Criminal Defense Lawyers explains, when, like many other defendants, Flynn pleaded guilty but later asserted his innocence, he did not expose himself to prosecution for criminal contempt of court. *See* Doc. 217-2, at 12-19.  Indeed, court-appointed amicus does not identify a single case in which a defendant was convicted of criminal contempt under Section 401(1) for false statements in pleading guilty or moving to withdraw a guilty plea.

### 1.    *False statements in a plea colloquy or motion to withdraw do not constitute actual obstruction.*

"[O]bstruction" is an "element [that] must clearly be shown in every case where the power to punish for contempt is exerted." *Ex parte Hudgings*, 249 U.S. 378, 383 (1919).  "Absent any evidence to warrant a finding of an actual obstruction of the administration of justice, there can be no violation of the first subdivision of Section 401." *In re Brown*, 454 F.2d 999, 1005 (D.C. Cir. 1971).

In the context of Section 401(1), the Supreme Court has construed the term "obstruction" narrowly, "against the background rule that the contempt power was to be confined to the least

possible power adequate to protect the administration of justice against immediate interruption of its business." *United States v. Dunnigan*, 507 U.S. 87, 93-94 (1993) (internal quotation marks omitted). The Supreme Court has therefore held that Section 401(1) requires a showing of "actual obstruction." *McConnell*, 370 U.S. at 236. Examples of "actual obstruction" include disruption in the courtroom or interference with court proceedings. *See Nye v. United States*, 313 U.S. 33, 48, 52 (1941). "[A]ctual, not theoretical, obstruction is the test," and "any claimed obstruction must be proven precisely." *Brown*, 454 F.2d at 1005. "[O]bstruction" thus has a much narrower meaning in this context than in others. *Dunnigan*, 507 U.S. at 93-94.

Court-appointed amicus contends (at 62 & n.63) that Flynn committed perjury before this Court, either in pleading guilty or in moving to withdraw his plea. The Supreme Court has repeatedly affirmed, however, that "perjury alone does not constitute an 'obstruction' which justifies exertion of the contempt power." *Michael*, 326 U.S. at 228; *see Dunnigan*, 507 U.S. at 93; *Clark v. United States*, 289 U.S. 1, 11 (1933); *Hudgings*, 249 U.S. at 383-384. The Court has acknowledged that perjury "may produce a judgment not resting on truth," but has explained that perjury alone does not "obstruct or halt the judicial process" within the meaning of Section 401(1). *Michael*, 326 U.S. at 227. That is because "the ordinary task of trial courts is to sift true from false testimony." *Dunnigan*, 507 U.S. at 93. Thus, "the problem caused by simple perjury [i]s not so much an obstruction of justice as an expected part of its administration." *Id.*; *see Clark*, 289 U.S. at 11 ("Perjury by a witness has been thought to be not enough where the obstruction to judicial power is only that inherent in the wrong of testifying falsely."); *Brown v. United States*, 356 U.S. 148, 153 (1958) (distinguishing "perjury" from "testimonial recalcitrance").

That is not to say that perjury must go unpunished. There is a separate federal criminal statute—enforced by the Executive—prohibiting perjury. 18 U.S.C. § 1621. Perjury also can

warrant an increased sentence. *See* U.S.S.G. § 3C1.1. But perjury, without more, simply is not criminal contempt under Section 401(1). *Hudgings*, 249 U.S. at 383-84. Because perjury, in itself, is not obstruction under Section 401(1), court-appointed amicus must point to something more in order to establish actual obstruction. He fails to do so.

Indeed, court-appointed amicus fails to cite a single case in which a court found actual obstruction under Section 401(1) because of false statements made in pleading guilty or withdrawing a guilty plea. In *United States v. Appel*, 211 F. 495 (S.D.N.Y. 1913), and *Collins v. United States*, 269 F.2d 746 (9th Cir. 1959), the contemptuous conduct consisted of a witness's refusal to testify, which courts, including the Supreme Court, have long distinguished from simple perjury. *See Brown*, 356 U.S. at 153 (distinguishing "perjury" from "testimonial recalcitrance"); *Yates*, 355 U.S. at 71 (treating refusals to answer questions at trial as "contempt within the meaning of 18 U.S.C. § 401(3)," not Section 401(1)); *Collins*, 269 F.2d at 750 ("The federal cases have generally followed this reasoning, punishing for contempt only when it is apparent from the testimony itself that the witness' behavior is substantially equivalent to a refusal to testify."); *Appel*, 211 F. at 495-496 (similar). And although the district court in *Okada v. Whitehead*, No. 15-cv-1449, 2017 WL 3442798 (C.D. Cal. July 28, 2017), noted that the defendant had "engaged in a pattern of conduct" that included "submitting false testimony," the basis for the court's criminal-contempt referral was not the false testimony itself, but the defendant's violations of the court's orders—namely, the defendant's "repeated attempts to sell Lions Gate, denial of access to Lions Gate, refusal to hand over all bank records relating to Lions Gate rentals, and refusal to hand over all non-privileged records stored on the 'www.lionsgatemansion.com' website or 'info@lionsgatemansion.com' email account." *Id.* at *4-*5; *see* 18 U.S.C. § 401(3). Because this

case involves neither a refusal to testify nor a violation of a court order, amicus's reliance (at 66) on *Appel*, *Collins*, and *Okada* is misplaced.

Court-appointed amicus nevertheless contends (at 67-68) that, if Flynn made false statements to this Court in moving to withdraw his plea, those false statements caused actual obstruction by "forcing the Court to suspend the briefing schedule and cancel the sentencing hearing" and by "vitiating the plea process and wasting courts' and prosecutors' time and resources." That contention lacks merit. To begin, it is mistaken as a factual matter. Flynn's motion to withdraw his plea was based not just on statements amicus asserts were false, but also on claims of ineffective assistance of his prior counsel. *See* Doc. 160-2, at 7-10. Those claims provide an independent basis for his motion. Thus, even absent any allegedly false statements, Flynn was entitled to move to withdraw his plea, with all the same consequences (*i.e.*, "suspend[ing] the briefing schedule," "cancel[ing] the sentencing hearing," "vitiating the plea process," and so on) that amicus asserts. *See, e.g.*, Doc. 165, at 1-4 (seeking a suspension of the briefing schedule on Flynn's motion to withdraw, to allow the government to seek information relating to his claims of ineffective assistance of counsel). Amicus therefore cannot point to any actual "obstruction" attributable to the allegedly false statements themselves.

Furthermore, even if the allegedly false statements themselves caused any delay or other effect on the proceedings, that effect would not be different in kind or degree from "that inherent in the wrong of testifying falsely." *Clark*, 289 U.S. at 11. Any lie in a judicial proceeding could be said to "derail[] the proceedings," Gleeson Br. 67, insofar as time and effort would be needed "to sift true from false testimony," *Dunnigan*, 507 U.S. at 93. But as the Supreme Court has recognized, "sift[ing] true from false testimony" is "an expected part" of the administration of justice, not "an obstruction" of it. *Id.* If the need to distinguish truth from falsity were enough to

qualify as actual obstruction under Section 401(1), then perjury, in itself, would always be criminal contempt—essentially eliminating obstruction as an independent element. If Flynn's motion were based solely on false statements, that would be reason to deny his motion to withdraw. But without more, it would not be a basis for prosecuting him for criminal contempt.[2]

Moreover, because amicus's principal theory of obstruction depends on the falsity of Flynn's statements in moving to *withdraw* his plea, that theory would require determining whether those statements were indeed false—or whether Flynn instead made false statements in *entering* his plea. Section 404(1)'s obstruction element should not be construed to require such a trial within a trial.

Seeking to avoid the need for such a trial, court-appointed amicus briefly argues (at 68-69) in the alternative that, even if it was Flynn's statements "when he pleaded guilty" that were false, there would still be obstruction, because those false statements "halted the prosecution" and "would have led to a wrongful conviction." But it is well established that perjury, in itself, is not punishable under Section 401(1), regardless of whether it "may produce a judgment not resting on truth." *Michael*, 326 U.S. at 227. False statements can always lead to an erroneous result, and if that were enough to establish actual obstruction under Section 401(1), then perjury alone would always be criminal contempt—contrary to Supreme Court precedent. Moreover, a guilty plea always "halt[s] the prosecution." Gleeson Br. 69. If that were enough to qualify as actual

---

[2]    Court-appointed amicus further contends (at 68) that Flynn "did not simply seek to withdraw his plea, but did so by mounting a frontal assault on the integrity of the investigation." That contention extends beyond Flynn's allegedly false statements, to argue that he committed contempt simply by criticizing the FBI investigation. But it is not "misbehavior" within the meaning of Section 401(1)—let alone actual "obstruct[ion]" under that Section—for a defendant to criticize an FBI investigation. Court-appointed amicus may disagree with Flynn's criticism of the investigation in this case, but that does not make Flynn's criticism "misbehavior" or "obstruct[ion]" under Section 401(1). *Cf. McConnell*, 370 U.S. at 236.

obstruction under Section 401(1), then that element would be satisfied any time a defendant entered a plea he later sought to withdraw based on an assertion of innocence. But that cannot possibly qualify as actual obstruction under Section 401(1), "given that [Federal Rule of Criminal Procedure 11(d)] expressly allows defendants to withdraw pleas lest innocent people be convicted." Judge Sullivan Resp. Br. 28, No. 20-5143 (D.C. Cir. June 1, 2020). Because false statements in a plea colloquy or motion to withdraw do not constitute actual obstruction, Flynn cannot be prosecuted for criminal contempt under Section 401(1).

> 2.    *False statements in a plea colloquy or motion to withdraw do not demonstrate an intent to obstruct.*

Section 401(1) also requires a showing of "contumacious intent," *Brown*, 454 F.2d at 1007—namely, an "inten[t] to obstruct the administration of justice," *In re Sealed Case*, 627 F.3d 1235, 1238 (D.C. Cir. 2010). "The foundation for the criminal contempt power is the need to protect the judicial process from willful impositions." *Brown*, 454 F.2d at 1006. Accordingly, this Court has recognized that "a degree of intentional wrongdoing is an ingredient of the offense of criminal contempt." *Id.*

Here, there is no evidence of "contumacious intent." *Brown*, 454 F.2d at 1007. Even assuming that Flynn had the intent to commit perjury, that would not establish that he had the "inten[t] to obstruct the administration of justice." *Sealed Case*, 627 F.3d at 1238. There is no indication that Flynn pleaded guilty and then moved to withdraw his plea as "part of some greater design to interfere with judicial proceedings." *Dunnigan*, 507 U.S. at 93. Rather, the record shows that Flynn—like other defendants who enter pleas they later seek to withdraw—pleaded guilty with the intent to resolve the allegations against him on the best terms he thought possible at the time. Doc. 160-23, at 8-10. And the record shows that he subsequently moved to withdraw his

plea for the same reason other defendants do—because he came to regret his earlier plea.  *Id.* at 1, 9-11.

As noted, our adversarial system treats plea colloquies and later motions to withdraw as an accepted part of normal judicial proceedings.  Fed. R. Crim. P. 11(b), (d).  An intent to acquiesce in the prosecution's charges, even falsely, is not an intent to interfere with judicial proceedings themselves for purposes of contempt under Section 401(1).  And an intent to withdraw a plea after having come to regret pleading guilty is something Rule 11(d) expressly contemplates; it, too, is not an intent to interfere with judicial proceedings themselves for purposes of contempt under Section 401(1).

Court-appointed amicus's contrary arguments lack merit.  Amicus contends that Flynn acted with the requisite criminal intent because "his conduct 'was self-evidently intended to show contempt for the court.'"  Gleeson Br. 69.  But that is not self-evident at all.  As explained above, there is no indication that Flynn pleaded guilty and then moved to withdraw his plea as "part of some greater design to interfere with judicial proceedings."  *Dunnigan*, 507 U.S. at 93.  Amicus further contends that even if Flynn realized after pleading guilty that "he misjudged his possible sentence," that does not permit him now "to disavow his guilty plea as a lie."  Gleeson Br. 70.  But whether Flynn can now disavow (*i.e.*, withdraw) his guilty plea is not the question.  *See id.* (citing only decisions affirming the denial of motions to withdraw guilty pleas).  Rather, the question is whether Flynn had an intent to obstruct the administration of justice under Section 401(1).  Court-appointed amicus does not point to anything in the record suggesting that Flynn had such an intent.

**B.    Even if Flynn's conduct constituted criminal contempt, the authority to prosecute him under the circumstances of this case would lie with the U.S. Attorney, not this Court**

As explained above, the Constitution vests the power to prosecute crimes in the Executive. To the extent that courts may exercise such power at all, it is only as "part of the judicial function."

*Young v. United States ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 795 (1987).  Thus, even if Flynn committed criminal contempt, this Court could initiate its own prosecution of him only if doing so were a valid exercise of "[t]he judicial Power."  U.S. Const. art. III, § 1; *see Young*, 481 U.S. at 800 n.10.

Such a prosecution would not be a valid exercise of the judicial power under the circumstances of this case.  The judicial power authorizes a court to initiate criminal-contempt proceedings—and to appoint a private attorney to prosecute the contempt—only when necessary to "vindicate its own authority without complete dependence on other Branches."  *Young*, 481 U.S. at 796.  This case does not fall within that narrow exception.  Even if Flynn's conduct constituted contempt, prosecuting that conduct would not be necessary to allow this Court to function.  The Court therefore has no authority under the circumstances of this case to initiate its own prosecution of Flynn or appoint a private attorney to prosecute him.[3]

### C.     No factual investigation into Flynn's allegedly false statements in pleading guilty or in moving to withdraw his plea is warranted

Because this Court could not prosecute Flynn under Section 401(1) even if he had committed perjury, there is no valid basis for conducting any factual investigations into whether Flynn made false statements before this Court and, if he did, whether extenuating circumstances existed.  Even if Flynn made false statements before this Court and no extenuating circumstances existed, that would establish only that Flynn had committed perjury—which alone is not criminal contempt under Section 401(1) or a crime this Court could prosecute as a valid exercise of its

---

[3]      This Court's order also refers to Federal Rule of Criminal Procedure 42.  Rule 42, however, addresses only "the manner of exercising" the power conferred by Section 401(1).  *Sacher v. United States*, 343 U.S. 1, 6-7 (1952).  It neither expands the definition of contempt nor provides authorization for initiating criminal-contempt proceedings.  *See Young*, 481 U.S. at 793-794.

Article III powers.  *See Young*, 481 U.S. at 796; *Michael*, 326 U.S. at 228.  Additional factfinding would thus serve no purpose—other than to burden the parties, delay the end of this case, and usurp power beyond Article III limits.

## CONCLUSION

The government's motion to dismiss the information in this case is an unreviewable exercise of prosecutorial discretion.  Under these circumstances, there is no remaining Article III controversy between the parties, and this Court should dismiss the case.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
N.Y Bar No. 4444188

KENNETH C. KOHL
Acting Principal Assistant United States Attorney
D.C. Bar No. 476236

By: _____*Jocelyn Ballantine*_____
Jocelyn Ballantine
Assistant United States Attorney
C.A. Bar No. 208267
555 4th Street, NW, Room 11-858
Washington, D.C. 20530
(202) 252-7252

Dated:  June 17, 2020